The next case, number 20-1912, Ricardo Jose Pineda-Maldonado v. Merrick B. Garland. At this time, would counsel for the petitioner introduce herself on the record to begin? May it please the Court. My name is Kimberly Williams with Rubin-Pomerleau PC, and seated at the counsel table is my co-counsel, Attorney Todd Pomerleau. I represent Petitioner Ricardo Pineda-Maldonado. I'd like to reserve two minutes for rebuttal. You may. Thank you. This morning, the petitioner asserts that there are five separate bases that this Court could grant this petition and remand the decision back to the agency because the Board's decision leaves no basis for which this Court can affirm the agency's decision. The first primarily is that the decision failed to follow this Court's precedent with respect to finding that the harm suffered by Mr. Pineda-Maldonado rises to the level of past persecution. It failed to address many, a number of decisions by this Court regarding the level of harm, particularly death threats as well as- On that point, where in the record is there affirmative evidence that a death threat was made against him? Yes, Your Honor. There was testimony regarding threats, but specifically death threats were noted in the respondent's declaration as well as in his asylum application within the record. Specifically, those threats were noted in the- I'm sorry, in his asylum application in the appendix on page 139 as well as in the transcript on the appendix on 64 to 65, and his declaration was also in the appendix on pages 147 to 48. And thank you for the cites, but what does he say there that- does he say they made a threat that they would kill me? Yes, specifically. So it's important to also know the context of how the entire series of threats started. And there's a misstatement both in the immigration judge's decision, which as the Court would know from the record as well, was wholly adopted and affirmed by the Board without any independent analysis. So for the purposes of this Court's analysis, you have to look solely at the immigration judge's review of everything. And so when the judge looked at it, she only, I think, mostly looked at the testimony and did not actually look at the record in and of itself, because at least based on her decision, it doesn't appear that she actually reviewed what the actual asylum application stated, wherein he actually said there were death threats in terms of- phone calls initially started in February of 2016. So Mr. Pineda-Maldonado's father was murdered by the men that actually started with these death threats in August of 2014. And some time had passed, and he had no reason to believe that anybody would be coming after him or his brother who these threats were made after. And so in February of 2016, there were initially a series of phone calls that were discussed both in the asylum application itself as well as- And what's the representation of the content of those calls? So the representation of the calls were that because both Mr. Pineda, who was the petitioner in this application, and his brother, who was a younger brother at the time, are both the sons of their father- I'm not on the nexus point. Yeah, but because they are of age and they are related to him, that they were basically going to die, that they were going to murder them. They were afraid that they were going to- No, I understand what they were afraid of. I'm asking what did they represent was said to them in the call. That they were going to take- that they were concerned that the petitioner was going to- I'm not asking what they were concerned about. I'm asking what they represent was said to them by the caller. That they were going to murder the petitioner. They say that in the application that the caller said, I will kill you? Yes, they were threatening to kill him and his brother. Okay. Yes. And then a series of the calls happened, and then thereafter there was a physical altercation by the same men that murdered his father. Let me ask you. Yes. His brother moved to like another town or city. How do you distinguish your client? Because couldn't he, if he's sent back, couldn't he move with his brother and go somewhere else? And there haven't been any issues there for several years as to his brother. Well, this was actually addressed during his testimony. So there's a distinguishing factor here. It wasn't that there were no other issues, and this was even addressed in the testimony. The brother's not living free and clear, and he testified to this. The brother had to move to another area and had to live in hiding, and he had to move around several different times. So there's actually case law on this, and it's Garcia Cruz that talks about internal relocation has to be reasonable. So even if someone can move around and you might be able to temporarily find a safe spot, it has to also be reasonable, and there's a series of factors that has to be addressed in that. So if one has to be in hiding all of the time, or if one can't have a job, if one can't live a reasonable life, it means that internal relocation is not reasonable. And that was one of the things that those factors were never considered by the immigration judge during the testimony, during anything that was asked during the questions. The immigration judge, correct me if I'm wrong, basically his brother relocated, so can he. That's basically what the… But his brother at the time, so obviously there's been several years that have passed during this decision, and new testimony has not been brought on that issue, but at the time that this was taken, only a short amount of time had passed, and the brother had only been internally relocated for part of the time, and there was even part in the testimony that the brother had actually left and come back, and he was still trying to hide. So he was not safe. There were still threats that were being made. That's part of the reason why Mr. Pineda-Maldonado left. They're still under threat, and they still have a fear that they could be killed. So just because one can possibly internally relocate and it may be safe for a time being doesn't mean that that internal relocation is reasonable, and the immigration judge never made that analysis, never asked the questions, never made that determination, but that also skips ahead on part of the analysis here because part of the issue here, as I noted in our brief as well, is that first the immigration judge failed to do a proper analysis of past persecution, and even in her decision, the only case that she cited to was a 2005 decision in Bokova. And this Court's own decisions in Lopez v. Hincapie as well as Un V. Gonzales talks about that when there are credible threats of death, which happened here because the immigration judge found him credible, and when you couple that, as in JAGAD, with actual physical harm, which again happened here, two incidents happened, that she found him credible. Under this Court's precedent, that is past persecution, so this is where the judge erred first in finding that no past persecution actually occurred. So this is error number one. So because she erred in this regard, then she further then erred by the nexus, which is where I'm going to next. So the second error that she had was finding that the reasons why these people were coming after Mr. Pena Maldonado as well as his brother was based on a family membership. And it was very clear that up until these particular men were coming after him and his brother, mostly him, he never had any reason to have any encounters with these gentlemen, never had any negative encounters. And every single interaction that was made, they very clearly said, we are coming after you because of your relationship to your father. We believe that you and your brother are going to seek reprisals against us because we murdered your father. Yes, there was an element of wealth that came up, but even this Court's precedent in Aldona Ramos as well as later in Maldonado allows there to be a mixed motive. But just on the question of how to disentangle whether there's any improper motive. Yes. To the extent a person is going to go after someone because they fear that person will do a reprisal against them, that alone doesn't implicate any protected status. Yes. And similarly, to the extent that I'm going after someone to collect a debt, that also does not alone. Yes. So it seems to me that necessary to your contention is that because they thought they would enact a reprisal against them and or thought they had a debt that they owed them, derived solely from the family status, that makes it a family status case. Is that right? Yes, because that's the only reason they came after them. They would have had no reason to target them for any other reason. And I guess the question is, does our case law address that circumstance? It's not exactly a mixed motive point if I'm following it. It's more a contention that the motive is fear of reprisal. The motive is debt. But the only reason I think you have the debt or that you present a risk to me of enacting a reprisal is because of your relationship to this person. And that's in part. But, yes, the case law does do it. This is a very similar case to the facts in O'Donnell-Ramos. It's also very similar to the case law as well as in Enamorado v. Rodriguez, which, as we pointed out in our brief at the time that the judge, if I could answer this because I'm over time, the judge did not have the benefit of Enamorado v. Rodriguez at the time that she issued her decision. And that would be another argument why I would say that this case should go back to the judge is that that case came out after she issued her decision. Okay. And the last question is, just so I get the factual basis for the removal itself, what is it? I'm sorry, Your Honor? What is the factual basis for the removal proceedings having been initiated? I'm not sure I understand your question. On what ground is there a reason for your client to be removed to begin with? He came into the United States seeking asylum. And what led to him then? How long ago was that? So he came into the United States in approximately April of 2016. And then when did the removal proceedings get initiated against him? They were initiated immediately, and he timely filed his application in September of 2016. Okay. Thank you. Is that all, Your Honor? Yep. Then I'll reserve my time. Thank you. Thank you, counsel. At this time, would counsel for the respondent introduce himself on the record to begin? Good morning. Yanal Yusuf for the Attorney General. Could you raise your mic up so I can hear you better? Is that better? A little better. Okay. I'll try to speak right into it. That's better. We have to adjust for taller people. May it please the Court, Yanal Yusuf for the Attorney General. The Court should deny the petition for review. Substantial evidence supports the agency's determination that the petitioner did not meet his burden of proof for asylum withholding of removal or protection under the Convention Against Torture. As it relates to asylum withholding of removal, the record does not compel reversal of the agency's determination that the petitioner did not demonstrate that his proposed particular social group, namely family ties to his father, was not a central reason for the harming experience. Based on that nexus determination, that is his failure to meet that burden is dispositive of his claim for asylum and withholding of removal. And turning to the conversation with my colleague earlier, as Your Honor noted, the question here is not whether or not the criminals went after the petitioner because of his father's relationship. Yes, his father's relationship was why he was brought to the attention of these individuals, but that was tangential and incidental and subordinate to the main motive, which was criminal individuals conducting their criminal acts to prevent someone from reprisal. Well, when you say that, would they have had any reason to think he would, they were at risk of reprisal absent the family relationship? There is nothing in the record to indicate that there is any connection outside of that debt that the father owed and that that was their interest in him. Well, let's take the debt. Is there any reason to think absent the family relationship that they owed the debt? That the son owed the debt? There is nothing in the record to show anything other than the fact that it's, he was brought to their attention based on the familial ties. Well, isn't that a problem for the government? No, because that connection quickly became tangential to their main motive. But they have no reason to think he owes the debt apart from his family relationship, so how can you disentangle it? But the family relationship is merely incidental here. These are criminal individuals seeking to further their enterprises. Well, truly incidental would be they happen to be related and owe a debt. So they want the debt. Incidentally, they're a family member. They don't care about that. Here, it's because they're a family member they think they owe the debt. So how is that incidental? Well, it's incidental because of the fact that they said, if you pay us, we'll leave you alone. We want our money and we're good to go. That's kind of what the question is. But that's true in Aldona Ramos, isn't it? I think in Aldona Ramos the evidence there was. Because they got the land. They were happy to let him go. But it sounded like in Aldona Ramos that there was a continued interest in that family despite getting that in terms of obtaining this financial kind of, once the family no longer had any financial motivation, they might have still been interested in that family. Here they told us what they're interested in. Give us the money and don't go after us. We'll leave you alone. And he said, unless you pay the debt, leave town. The focus again and again was the debt and preventing any potential reprisal. And so, yes, he was brought to their attention based off of that family connection, but that quickly and based on his own testimony became secondary. So if I target political opponents and I say to them, your money or your life, and I'm only going after you because you're a political opponent, that's not a nexus? Well, I think that might be a distinct sort of. I'm asking that question. The government official says to a political opponent, your money or your life, and I chose you because you're my political opponent. If you chose me because you're my political opponent, then in that case, then that would be a nexus. But I only want your money. I only want your money. You pay me off, you're good to go. And I'll kill you if you don't pay me, but is that a problem or not in the government's view? I think that would be a problem. So how is this case different? Because here they only chose him on your account because of the family status. They'll let him go if he pays. If he doesn't pay, they'll kill him. But the question here, was it a central reason for him to be targeted to have that experience? Same in the case of the political opponent. Was it a central reason that they chose to say your money or your life that it was a political opponent? Yes. Here, was it a central reason that they asked him to pay the debt that he was a family member? Yes. Going back to hypothetical, is the political opponent, is the political dynamic the reason why they were targeting those people? Was it just I know my political opponent is wealthy, so I'm going to target them? That changes the dynamic. And same thing here. It's about the fact of whether or not his familial relationship was a central reason. If there was that, excuse me, if the debt wasn't there, would they have targeted him? We don't know. But the fact of the matter is that's what their interest was. That's what he told us many times on the record. It was that fact. And they made it clear. If you pay the debt, if you don't pay the debt, leave. So it was really again and again about the money. And I think that's where the agency correctly determined that. Let me ask you also, there's some testimony also that the police were in cahoots with the gang members there. Does that change anything? Well, I think in that regard, that's merely speculation on the part of the petitioner that they were in cahoots. There was no indication. He presented nothing other than happening to see individuals, I believe thieves in the police, out somewhere. And that was the extent of it. And so I think that – The petitioner's testimony also asked him about his father. Are you his son? By the policeman. And then they beat him up. Well, I think in that case, that circumstance was the petitioner was stopped after leaving a soccer match, and there's indication that the police had no idea who he was. They simply asked him his name and searched his bag and then discovered – sorry, asked his name, searched his bag. And then when they discovered that he was the, I guess, Victor's son in that situation, the petitioner testified that they continued to attack him. And I think in that circumstance, that piece of evidence alone doesn't demonstrate, one, that they are working with the thieves that were going after the debt. And secondly, if it was a situation where it was just corrupt police officers, that there were – if, say, we assume that they were in cahoots with these thieves, then it was simply corrupt police officers seeking to themselves for that criminal enterprise of seeking to get that debt paid, if that was, in fact, the situation. But I think these – the critical focus here has to be does the record compel reversal of the agency's determination. There might be evidence to support a contrary conclusion, but the record here, the petitioner did not show the record compels reversal of the agency's determination. What's your best case for a situation in which there's no other reason for the – let's say I disagree with that just for purpose of this. What's your best case for suggesting that when the alleged persecutor, and for purpose of this question, just take as a given that the record shows that they – there was evidence that the perpetrators threatened to kill the petitioner. What's your best case for suggesting that when the only reason to think that they're going to be at risk of reprisal or that there's a debt is the protected class of the person, that that doesn't make it a central reason? I think in this case, if I'm answering your question, the court has said that the family membership has to be at the root of the persecution, has to be the reason why this is all happening. I understand that, but what I'm asking you is in this case, I take it – one version of a case like Villalarta where a person happens to be – have a family relation, but there's no indication that the family relation is why they think she has the money. What I'm asking you is in a case in which the reason – one reason they want it, and a key reason is they want money, or another reason is they want to stop reprisals, but the only reason they think they're at risk of reprisal or that the target has money is because of their family status. Is there a case addressing that question that is favorable to the government? I don't know if there's a case specifically on point, but I think in Marin Portillo, I believe it was a circumstance where an individual was targeting the family because they pressed charges against him, and the court found that that was a personal circumstance. Even though that he was going after each family, exclusively the family, it was in regards to them pressing charges against him and not specifically for that family reason. Right, but in that instance, they were – the charges were actually brought. Here, there's just a fear of reprisal or an assumption that this person owes a debt, and the only basis for it is the family status of that person. In other words, it's not true. He doesn't actually have the debt. There's no indication he has the debt. There's no indication he will affect reprisals. The perpetrator thinks that those things are true because of family status. At least the record would seem to support that conclusion, right? You don't even deny that. Well, it's – what's the persecutor motivated about here? Is there a case addressing a situation where the motivation, money, reprisal, traces solely to the perpetrator's assumption that those are concerns because of the family status of the target? I don't know of a specific case addressing that direct issue. Okay, well, then if there's not case law addressing it, why should we treat it the way the government wants to treat it as if it's just incidental? Because of what the petitioners told us what this is about, which is that there was a debt paid. They told him, if you pay this debt or if you don't pay this debt, you leave. And so that's – their motivation, time and again, is that they're seeking to further their criminal enterprise, and it is about the money for them. That's what – that's specifically what the persecutor has told us, and that's what it's – what they have – what petitioners testified to. And based off of that, that is – that demonstrates that that's the main motive, and the essential reason is not his family relationship. That happened to be tangential to that fact, them furthering their criminal enterprise. Last question. Has this case been through our CAMP process? I don't believe it has. And does the government have a view about whether it would benefit from going through that process? Not – I think the court should deny the petition for review, but if the court wishes to direct it that way, that is up to the court. Okay. Thank you. I'm sorry, may I ask? Yeah, please. I just want to do a slightly different hypothetical. So you've got a small church, and one of the members owes a debt, and the thieves go after all of the members of the church to try to get them to repay the debt. So same facts here. It's not a family. It's a church. Government position would be the same. The primary motivation for the conduct is to get the debt paid, but they target members of a church. I think – going back to this court's case, Senator Ruiz-Escobar, the protected ground has to be the root cause of what is happening, what is in this situation going after the church members. If the evidence doesn't show that that is the root cause, that that is the central reason for why they're being targeted, then I think, again, that would not meet the standard of establishing the requisite nexus. I don't think I understood the answer to that question. Were you saying that in that case it would be a nexus to religion, or were you saying it wouldn't be? It would not be. So if they said to every member of the church, we'll kill all of you unless you pay this debt, that would be fine? I mean – Well, that's the question, isn't it? Well, I think it's – the focus from Elias Zacharias is the persecutor's motive. What is the persecutor's motive? In the case, the hypothetical is the church, they think every church member owes that debt. So they say to every church member, we'll kill you unless you pay it. And we would say as to all of those church members, it's not based on their religion. If that's exactly what the – as the hypothetical is presented, that it's about getting that debt, then the church – then their membership in the church is incidental to that. Okay. Thank you so much, Your Honor. Thank you, counsel. At this time, counsel for the petitioner should reintroduce herself on the record to begin her two-minute rebuttal. Thank you. Attorney Kimberly Williams for the petitioner, Mr. Pena Maldonado. Again, I'd like to just touch back on the issue of the harm, again, here in the nexus. So every single incident, when you read back through the testimony and you read back through the petitioner's declaration and his assignment application, it's very clear every single incident was prefaced with, we are coming after you because of your father. Every single one. Even when they were stopped, the men, the persecutors, during the first physical incident said, again, we are coming after you because of your father. When the police officers stopped them, again, they said, what's your name? Are you Victor's son? Again, made it very clear, because you're Victor's son. So it's very hard to sit here and reconcile that there is no other motive, at least for the one central reason, that they were coming after him because he was his son. Now, if the ultimate goal was because they were concerned about reprisals or money, fine, there could be a second motive, but the one central reason was because he was his father's son. And so that is why this Court has to find that the immigration judge erred, that there was not a protected ground, a protected nexus. And then I want to pivot to another point that we recently brought up, and that since the issuance of this case, matter of AB, which was the one and only decision that the Board relied on in deciding its case, has been since vacated by the Attorney General. And for that reason alone, this Court should vacate this decision and send it back to the agency. I understand that it's been two years since that was done. We submitted a recent 28-J letter on that. But because the Board itself did not do any independent, on anything that the immigration judge issued in terms of her decision, the only decision that they actually wrote in theirs was the original matter of AB in 2018. So on that alone, that deserves a remand because this Court can't, you know. Before you end, two things I want you to address. One is the nexus issue is not relevant to the Catt claim, correct? Not specifically to the Catt claim, but there is an independent basis, which we did argue that the judge failed to provide any sort of independent analysis on that. So also because of recent court precedent in Hernandez in this Court, it should be remanded for that. We would argue there's potentially a Catt claim as well. Okay. And then secondly, on the camp issue, do you have a view? I mean, I think we are divides apart, that I'm not sure that the government and us could come to a ground here. I think there, like I said, I had five bases. We only got to, I think, three out of the five today. I think this deserves a remand, and I'm not sure the government and us could come to an agreement. It might not be the best use of judicial resources to do mediation, but we'd be open to it. Okay. Thank you. Thank you, Your Honor. We will rest on our briefs. Thank you, counsel. That concludes argument in this case. Counsel is excused.